And we'll call the next case United States of America v. Michael R. Scalia. And we'll call on Mr. Siegel again. Thank you, Your Honor. Who's to say a man can't argue two cases on the same day? I'm honored to have the opportunity, Your Honor. For the record, my name is Dan Siegel and I represent the appellant Michael Scalia with the permission of the court. I request three minutes for rebuttal. How many minutes? Three minutes. That request will be granted. With your permission, Your Honor, I would like to begin this argument by identifying what I think is the strongest argument in favor of the government's position. This defendant, Mr. Scalia, was sentenced in 2011 and the drug guidelines weren't reduced until 2014. So how can the ex post facto clause benefit a defendant if he's relying on a guideline which wasn't passed until after he was sentenced? My response is this. It is true that when Mr. Scalia entered his plea of guilty and was sentenced, he couldn't know that the sentencing commission would reduce the severity of the drug guidelines. But he could know that if they did reduce the severity of the guidelines, that there was a guideline, 1B1.10, which provided the judge with a liberal standard and liberal authority to grant a reduction below the newly revised guideline range. So if the question is, does the defendant have the right to rely on favorable laws that were in effect at the time that the crime was committed and at the time that the guilty plea was negotiated and entered, then 1B1.10 was a favorable law. Second point, does he have a reliance interest in that? The Supreme Court case law seems to reflect that reliance is at the core of the ex post facto clause. There was a favorable legal standard. 1B1.10 was more favorable than the current standard in terms of giving rules for applying these retroactive reductions. So it's reasonable to say that he relied on it. What case talks about the ability to have favorable laws applied in the ex post facto context? The case that I cited, Weaver v. Graham, uses the phrase reliance. I'm talking about favorable law as compared to... The case law that I've looked at talks about ex post facto as applying when the later law increases the punishment for what you did way back when as compared to taking away discretion of a court. That's really what we're talking about here. The discretion has been taken away by virtue of the later guideline. And I think Weaver v. Graham is the case that deals with that because that's where they were dealing with the Florida gain time statute, which we would call a good time statute. That is, the defendant had the right to get time taken off. And the government made the exact same argument. They said, look, this only applies to increasing sentences. Good time, gain time statutes only reduce sentences. It's not within the ex post facto clause. The Supreme Court said no. The Florida gain time statute comes within the ex post facto clause. He had the right to the more favorable standards at the time the crime was committed, even though it reduces his sentence rather than increases his sentence. So the question then is, well, has the Supreme Court in some way recognized that there's a reliance interest that applies when you're negotiating the plea agreement? After all, this defendant entered a plea of guilty. He's presumed to be on notice of the legal standards then in effect. And the Supreme Court dealt with that in the Weaver v. Graham case, which we cite in the brief, but I think it's an important quote, so I'll just read it briefly. We have previously recognized that a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed. That was one of the factors that went into the court's ex post facto analysis. Yes, Your Honor. Having said that, and I understand your argument, but one of the problems here that you've, an additional problem that you face is that Amendment 782 didn't exist at the time of the sentence. I think the sentence was 2010. You said 2011. I thought it was 2010, but either way, it didn't exist at that point. And the answer to that is no reliance on 782, but reliance on 1B1.10, reliance on the fact that if they were to make a retroactive reduction in the guidelines, that there would be a good standard at 1B1.10 that would give the judge discretion over the decision whether to reduce it and also the decision how far to go. Remember, under the old 1B1.10, you could go below the bottom of the new guidelines. Under the new 1B1.10, you can't. In essence, this might mean a small difference for Mr. Scalia, a few months more off of his sentence for him and for persons who are similarly situated. But if a person has the right, and I think under Weaver v. Graham he does, to reasonably rely on a favorable legal standard that might get him a lower sentence sometimes down the road, and he relied on it when he negotiated it. Yes, Your Honor. Let's assume, why should, do we need to rely on or consider Weaver? That is, do we have to deal with the timing of 1B1.10? Or can we just more broadly hold that the ex post facto cases, from the beginning almost to the end, deal with an increase in punishment? And the Diggs case. Well, I think the answer is. Which, on similar facts, was a bad case for you. I think that you would have to say, there are lots of ways that a person's sentence may be reduced. And the Supreme Court in Weaver v. Graham, and I think other cases too. Weaver v. Graham didn't stand alone. The question is to create a dividing line between what is ex post facto and what isn't. For example, in Weaver v. Graham they said you can't take away the defendant's, the prisoner's right to get a good time reduction. But in a later case they said, well, you can change parole hearings and commutation hearings. They don't have to be so closely spaced. You can have them over a longer period of time. And the rationale for that was, well, he still has the right to get his hearings. But if you take away his right to use the old statute, he's totally taken away from it. Now consider what happens here. This isn't just a situation where the sentencing guidelines raise the bar. This is a situation where the sentencing guidelines bar the door. That is, there's nothing that a person in Mr. Scalia's position can do to meet the requirements and get a lower sentence. It's not like he can take a college course or get a GED or show good conduct while he was in prison. No matter what he does, he can't get below that minimum guideline. Now, if they pass a new statute which says, well, in order to get this 1B1.10 reduction, you have to get a GED, take a college course, show some good conduct, show some spiritual development. If you have a statute like that, then it's something a person can meet, and arguably it doesn't violate the ex post facto clause because you still have a right to try to get the reductions, and it's something that's possible to do. In this case, it's not possible for Mr. Scalia. Let me ask you this. I don't know if you've done this research. If you know, why did the Sentencing Commission change that policy statement, 1B1.10? Why did they change it? I don't know why they changed it. I have to presume that they wanted to be more severe with the defendants. But that's just an assumption on my part. Your Honors, I think I've made all three points that I wanted to make. He relied on a favorable law. Well, we'll have you back on rebuttal. Yes, Your Honor. By the way, we did make some arguments regarding commutation and making analogies to commutation. We rely on those arguments, but I think that the briefs state them adequately. Yeah, okay. Unless there's a question. May I rebuttal? Yes, Your Honor. Seems simple. Mr. Weed? Yes, Your Honor. Is that how it's pronounced? Yes, it is. Okay. Thank you. May it please the Court, Sean Weed for the record for the United States. As the government pointed out in its papers, every court of appeals to address the defendant's argument here has rejected it, and it's for the reason that the Court is highlighting in its discussion. The Eastern District of New York didn't reject it. That's correct, Your Honor. Judge Weinstein, in that opinion, didn't. May I just interject? That was raised only so that Mr. Siegel could withdraw his motion to withdraw representation. The Alla Bologna case, Judge Weinstein, and not raised in any of the briefs since. Your Honor is absolutely correct. I would also point out that Judge Weinstein or the Court in that opinion didn't cite to any of the courts of appeals that have expressly rejected that issue. In fact, what the Court there was relying on was a district court opinion from the Northern District of Illinois called Diggs, which has since been reversed in the Seventh Circuit v. Diggs. So I would point out that that case would be a – I wouldn't hang my hat on that case. Well, let me ask you the same question I asked Mr. Siegel. I guess if I struggle with this at all, I struggle with, you know, why did the Sentencing Commission change this policy statement? Your Honor, as this Court pointed out in Barbarena, the Sentencing Commission changed this specific provision because it was causing too much litigation in terms of what was a departure and what was a variance in terms of what the sentencing court's discretion was, in terms of what it could do in a properly filed 3582 motion. And the argument was, look, given that courts are interpreting this differently, we don't want to have a sentencing disparity issue with regard to different defendants in different districts. So we're simply going to make this very clean, and now you have the resulting 2BA that's before the Court. Would you distinguish Weaver? Yes, Your Honor, very much so. And I think the key is that this isn't a case where eligibility was given to the defendant for a sentencing reduction and then yanked away, and that's what the case in Weaver was. And Mr. Siegel correctly points out that's a good-time or game-time statute case. Well, it's early release. Exactly right, Your Honor. So the point in Weaver was, look, at the time of the offense, Weaver could look and see exactly what his release date was going to be, provided that he didn't make a mistake, provided he didn't step out of line. So, for example, if he's sentenced to a 10-year sentence, he knows he's getting out in seven. So in Weaver, what happens is the Florida legislature says, okay, we're going to change that formula a little bit. By the way, it's to your detriment. So now you're getting out in, I think there was a two-year difference in Weaver in terms of what his release date was. So there it's very clear, if the Court's going back to what the standard is here, there's more punishment, but for that law, than there was at the time of the offense. You just don't have that here. And the reason you don't have that here is because, you know, the defendant said repeatedly in the brief, said, look, I was eligible for a sentencing reduction in the time of the offense, which would be 2009, at the time of my plea, at the time of my sentencing. And if the Court looks at Section 1B1.10, at any of those times, the defendant is not eligible for a sentencing reduction because, as the Court pointed out in Mr. Siegel's argument, the amendments weren't yet listed. And this Court has been very clear that eligibility is absolutely tied to those amendments. You don't get through the front door unless one of those amendments is in place. So Weaver is clearly distinguishable here because at the time of the defendant's offense, at the time of his plea, at the time of his sentencing, he was not eligible for a sentencing reduction under 1B1.10. Only because the amendment had not been passed promulgated by the Sentencing Commission. That's correct, Your Honor. Okay. But there was that comparably less language in the prior policy statement. There was, yes, Your Honor. You know, we're in a time, I don't know that you'd start it in 2010, but shortly thereafter, there's been a fair amount of changes in the drug tables and the drug guidelines. And it looks to me that based on what Congress has on their agenda and, you know, the way the Justice Department's been speaking, that there are going to even be more changes. So why is it a reasonable sentence for a defendant to ask counsel to say, you know, what's all this mean? I have 108 months, but do I ever get a chance to reduce it below 108 months? No, we don't have good time. But, you know, there is this provision that if there's ever any reductions, you'll get a comparably, the potential for a comparably less sentence. Why isn't there some similarity between that and Weaver? Your Honor, because, again, I think it goes back to what eligibility was at the time, not a speculation as to what was going to happen in the future. And I think that's the key distinction between Weaver. Well, there's speculation in good time. I mean, you know, Weaver, what strikes me about Weaver, you know, good time, people assume, well, good time means you're going to get, you know, 60 days off every year. That's not true. You know, you have to behave to get good time. And that doesn't happen all the time. Everybody doesn't get good time. So there's some speculation there. Well, Your Honor, at least then the ball's in the prisoner's court, right? And I think that the Supreme Court took pains to point out in Weaver that essentially the game time system that was in place was a mandatory system. That's footnote 20 of the opinion. Points out very carefully, says, look, you're going to get good time in this circumstance. Here, essentially what the defendant is doing is he's saying, well, look, at some point in the future a body, which in the end has ultimate discretion in this area, which is the Sentencing Commission, might pass an amendment that might apply to you, and in those circumstances perhaps you could get a similar variance to the one now. Yeah, and that's what, when he's sentenced, the judge says, you know, okay, the guideline is 135 to 168, but you're entitled to a variance. You're entitled to something better. You're entitled to less punishment than what the guidelines provide because X, Y, Z. Why wouldn't it be a reasonable expectation that, oh, if they later say, you know what, that guideline was wrong and it really should be 108 to 120. That should apply. Well, why then, if that's the run-of-the-mill sentence for that crime, remember, I'm entitled to a variance. Remember, I should be varying below what you said is the right amount, and this takes the ability away and says, no, you're really going to be sentenced at the bottom of the guideline range, even though the prior judge said, you know, you're entitled to a lesser sentence than that. Doesn't that have a similar effect as Weaver? No, I think that there's – I certainly understand where the court is going and what I would say is in this context it's different in the sense that, again, we're going back to a body that has discretion. That would be kind of like saying in the Weaver – Right, and it takes the discretion away totally from the judge. Well, what I would argue, Your Honor, is that that discretion was never given at the time of the defendant's offense, plea, and sentencing. Again, if you – Sure, they did have discretion because he sentenced them to 108 instead of 135. Your Honor is absolutely correct. Under Booker, under the sentencing scheme in place at the time of his initial sentencing, the court had discretion. My point that I'm perhaps inartfully making is on a motion for reduction of sentence, which is what 1B1.10 governs, at the time of his offense, plea, and sentencing, he had no such right. The district court had no such discretion to reduce his sentence because if you look at essentially A1 of 1B1.10, that's what the authority section is. That's where it says, look, here's the only place and only time when the sentencing commission is going to give discretion to the district court. And at all three of those times in the case of Mr. Scalia, the district court had absolutely no discretion to reduce his sentence. So, therefore, if he's forecasting into the future circumstances under how the sentencing commission might pass a subsequent amendment, he's purely speculating as to what discretion a district court would have to reduce his sentence in that context. But the defense attorney better warn them that that's a possibility else he's going to get a malpractice action when he doesn't get it later. Your Honor, that very well might be the case, absolutely. I don't want to beat a dead horse here, but I guess I'm struggling trying to see the distinct, to completely see the distinction between this and the award of good time. Because there is discretion. There's some statutory guidelines and administrative policy in guide. Somebody has to determine that you obeyed the rules in good time. It's just not show up in prison, serve a year, get minus 60 for that year. You have to apply. So here you had this provision that something might happen in the future. It's not totally unlikely. The sentencing commission has done that. I mean, I certainly, if I were representing a defendant today and were asked those questions and the 09 language was here, it would be hard pressed to say you have no chance in the future to get a reduction if that comes along. And here the sentencing commission, because there's complaints about distinction between departures and variance, wipes that language out. Yes, Your Honor. I think the distinction again is eligibility. That's the key point. And I certainly get what the court is saying in terms of, well, look, this is never going to be completely a fait accompli. Right. But in the end, it turns on eligibility. And at the time of the defendant's offense, plea, and sentencing, he was not eligible. Your Honor, I forgot. I wanted to leave the court with one. It takes away the eligibility for a variance below a new guideline rate that never existed before. What I would say is, essentially, there was never any eligibility because we never get past 1B1.10A1. There was never an amendment in place. So, therefore, the section itself never applied to the defendant. But if I could leave the court with one point, it would be this, in that if you look at Weaver v. Graham, if you look at Garner v. Jones, you look at Lenz v. Mathis, you look at any of the other Supreme Court cases in this area, in the end, you always look at what the remedy is for a next post facto violation. And what the remedy is, is you go back to the sentencing scheme at the time of the offense. And if you look at 1B1.10, not to beat a dead horse here, but at the time of his offense, he's not entitled to a sentencing reduction. Okay. Thank you, Your Honor. I understand your point. Mr. Siegel, do you have anything else? Very briefly, Your Honor, I would like to begin by following up on your point regarding a possible similarity with the Weaver v. Graham case and with Goodtimes. And I think the similarities of both of them involve a contingency. That is, when you are applying for Goodtime, there is a contingency that your behavior will meet it and that the prison officials will come to the conclusion that your behavior has met it. So it's not an exact match, but there is some contingency in Weaver v. Graham. To Judge Rendell's point about reasonable expectations and about the discretion at the time of sentencing, we submit that if it's true. Look, my clients go to jail all the time because of statutes that they didn't necessarily know about. And because of that, we have a presumption that people are on notice of what the law says. If Mr. Scalia was on notice of what the law says, then 1 v. 1.10 said that he had the right to a liberal standard if there was at some point in the future a reduction. And finally, to Judge Barry's point, the concern about misadvice from counsel, I think you've presented a very important point. If I were representing Mr. Scalia back in the day and I were trying to discuss with him the benefits of a plea bargain, I'd say, look, there's a possibility that they're going to reduce the guidelines. And look, there's this standard 1 v. 1.10. I can argue for an even lower sentence than the minimum. Do your best in jail. Show good records and the judge will do his thing on your behalf. So those are the arguments. Thank you, Your Honor. Okay. Well, we thank both counsel, and we thank both counsel for their excellent arguments in this case and in the prior case, and we'll take this matter under advisement.